Methel WALKER, Claimant, Respondent,

v.

UNIVERSAL TERMINAL & STEVE-
DORING CORP., Employer,

and

Midland Insurance Company,
Carrier, Petitioners.

No. 80–2142.

United States Court of Appeals,
Third Circuit.

Argued Jan. 12, 1981.

Decided April 10, 1981.

Leonard J. Linden (argued), Linden & Gallagher, New York City, for petitioners.

John R. Schwartz (argued), Miller, Hochman, Meyerson & Schaeffer, Jersey City, N. J., for claimant-respondent.

Before SEITZ, Chief Judge, ROSENN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Jessie Walker, a longshoreman, died while at work unloading a vessel on August 20, 1971. His widow, Methel Walker,[1] filed a workmen's compensation claim under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950 (1976 & Supp. III 1979). An administrative law judge (ALJ) denied the claim, finding that Walker's death was caused solely by intoxication. The Benefits Review Board (BRB) reversed on the ground that the ALJ's decision was not supported by substantial evidence. Following a remand to the ALJ for computation of the amount of compensation and a subsequent

affirmance by the BRB, the decedent's employer, Universal Terminal & Stevedoring Corp., and its insurance carrier, Midland Insurance Co., petitioned this court for review. We grant the petition and, concluding that the decision of the ALJ was amply supported by substantial evidence, reverse the decision of the BRB.

### I.

On August 20, 1971, Walker, a longshoreman employed by Universal Terminal & Stevedoring Corp., was assigned to work on the vessel AMERICAN LEGEND at Port Newark, New Jersey. He began work at approximately 1 p. m. on the deck of the ship with a fellow longshoreman, Lindo Pugh. Their sole task was attaching hooks from the large overhead crane to the top of hatch covers so that the hatch covers could be removed making the cargo below accessible. In carrying out their assignment that afternoon, Walker and Pugh climbed on top of a hatch, an elevation of five to six feet above the deck. They reached the top by climbing short ladders along the sides of the hatch. After they had assisted in attaching the cable from the crane to the hatch cover, each man prepared to descend from the cover. Pugh grabbed an adjacent cable and slid the short distance down it to the deck. Walker was observed crouching as if to jump to the deck. No one saw him actually alight from the hatch cover. Several minutes later, Pugh went looking for him and found Walker lying unconscious on the deck beside the hatch. Nearby, permanently attached to the deck, was a 2½ or 3 inch pipe. This pipe ran parallel to the deck a few inches above the surface. Pugh saw no indication, however, that Walker had struck the pipe or the deck.

Pugh obtained assistance and with the aid of the crane, operated throughout that afternoon by Edward Muse, Walker was removed from the ship on a stretcher. He was pronounced dead on arrival at the hospital. The specific physiological cause of

1. During the initial proceedings, Mrs. Walker's first name was identified as "Methal." She subsequently has been identified as "Methel," the spelling we shall use.

death is not at issue: Walker, in a semi-conscious state, had vomited, aspirated the vomit, and asphyxiated. In dispute is what triggered these events. The claimant argues that either falling or jumping from the hatch cover, Walker struck his head and was rendered partially unconscious. The employer and insurance carrier contend that Walker became partially unconscious solely as a result of the intoxication. As is often the case, each side presented medical testimony in support of its position at the hearing on the workmen's compensation claim.

Relying on the evidence produced at the administrative hearing, the ALJ concluded that Walker's death was caused solely by his intoxication. To reach this conclusion he specifically credited the testimony of Dr. Milton Halpern and rejected, on one point, the testimony of Dr. Thomas Santoro. On appeal of the claimant, the Benefits Review Board of the United States Department of Labor reversed, holding that the ALJ's decision was not supported by substantial evidence.

## II.

This court previously has considered the initial and review procedures appropriate in cases involving claims for compensation under the LHWCA:

> A disputed claim for compensation is first heard before an ALJ. The ALJ makes findings of fact and determines the validity of the claim. 33 U.S.C. § 919. The losing party may appeal to the BRB which reviews the ALJ's decision but it does not make any independent findings of fact. 33 U.S.C. § 921. The statute provides for the BRB's scope of review: "The findings of fact in the decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole." 33 U.S.C. § 921(b)(3).

A dissatisfied litigant may then file a petition for review of the BRB decision in the United States court of appeals. 33 U.S.C. § 921(c). The statute does not set forth the standard of review to be applied in the court of appeals. Case law has established, however, that this court is to review the decisions of the Benefits Review Board for errors of law, and to make certain that the BRB adhered to its scope of review provision. *Sun Shipbuilding & Dry Dock Co. v. Walker*, 590 F.2d 73, 76 n.12 (3d Cir. 1978); *Director, OWCP v. Universal Terminal & Stevedoring Corp.*, 575 F.2d 452, 454 (3d Cir. 1978); *Presley v. Tinsley Maintenance Service*, 529 F.2d 433 (5th Cir. 1976).

.        .        .        .        .

It is true that this court does not determine if the Board's decision is supported by substantial evidence; we review the Board's determination of whether the ALJ's decision is supported by substantial evidence. In order to determine whether the Board has properly adhered to its scope of review, the court of appeals must make an independent review of the record and decide whether the ALJ's findings are supported by substantial evidence.

*Sun Shipbuilding & Dry Dock Co. v. McCabe*, 593 F.2d 234, 237 (3d Cir. 1979) (footnote omitted).[2] This approach—reviewing the Board's determination of whether the *ALJ's decision* was supported by substantial evidence, rather than determining whether the *BRB's decision* was supported by substantial evidence—is followed in other circuits. *Bumble Bee Seafoods v. Director, Office of Workers' Compensation Programs*, 629 F.2d 1327, 1329 & nn.1 & 2 (9th Cir. 1980); *Avondale Shipyards, Inc. v. Vinson*, 623 F.2d 1117, 1119

---

2. The scope of BRB review of the decision of the ALJ is also limited by regulation.

The Benefits Review Board is not empowered to engage in a de novo proceeding or unrestricted review of a case brought before it. The Board is authorized to review the findings of fact and conclusions of law on which the decision or order appealed from was based. Such findings of fact and conclusions of law may be set aside only if they are not, in the judgment of the Board, supported by substantial evidence in the record considered as a whole or in accordance with law. 20 C.F.R. § 802.301 (1980).

n.1 (5th Cir. 1980); *Potomac Electric Power Co. v. Director, Office of Workers' Compensation Programs*, 606 F.2d 1324, 1326 (D.C. Cir.1979), *rev'd on other grounds*, —— U.S. ——, 101 S.Ct. 509, 66 L.Ed.2d 446 (1980); *Bath Iron Works Corp. v. Galen*, 605 F.2d 583, 585 (1st Cir. 1979).[3] We see no reason to reconsider the standard of review in this case.

## III.

■ The Act provides that "[n]o compensation shall be payable if the injury was occasioned solely by the intoxication of the employee or by the willful intention of the employee to injure or kill himself or another." 33 U.S.C. § 903(b) (1976). The statute also recognizes a presumption against a finding of intoxication. "In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary . . . (c) That the injury was not occasioned solely by the intoxication of the injured employee." *Id.* § 920. This presumption has weight, however, only in the absence of substantial evidence negating the presumption. Once evidence has been presented sufficient to justify a finding contrary to the presumption, "the presumption falls out of the case." *Del Vecchio v. Bowers*, 296 U.S. 280, 286, 56 S.Ct. 190, 193, 80 L.Ed. 229 (1935). The presumption does not have the quality of affirmative evidence. *Id.* at 285, 56 S.Ct. at 192. Once rebutted the presumption has no ef-

fect on the case. *St. Louis Shipbuilding Co. v. Director of the Office of Workers' Compensation Programs*, 551 F.2d 1119, 1124 (8th Cir. 1977); *John W. McGrath Corp. v. Hughes*, 264 F.2d 314, 317 (2d Cir.), *cert. denied*, 360 U.S. 931, 79 S.Ct. 1451, 3 L.Ed.2d 1545 (1959).

■ In cases involving LHWCA statutory presumptions, the court must use a two-part test. *Travelers Insurance Co. v. Belair*, 412 F.2d 297, 301 n.6 (1st Cir. 1969). Specifically, in this case, we must first determine if the employer has presented sufficient evidence to rebut the presumption against a finding that Walker's death was caused solely by intoxication. If we conclude the presumption has been rebutted, then we must employ the familiar substantial evidence test to determine if the ALJ's decision is properly supported. *See* part II *supra*. We now apply this test to the facts of this case.

## IV.

At the hearing before the ALJ, the claimant and the deceased's employer did not dispute the immediate cause of death: Jessie Walker became only partially conscious, vomited, and subsequently asphyxiated. The claimant, however, maintained the partial unconsciousness was caused when Walker struck his head in the course of jumping or falling from the hatch cover. Universal Terminal contended that the reli-

---

**3.** Although the standard of review is not disputed by the parties in this case, we note that other circuits have stated that the decision of the *BRB* should be upheld if it is supported by substantial evidence. *Maryland Shipbuilding and Drydock Co. v. Director, Office of Workers' Compensation Programs*, 618 F.2d 1082, 1084–85 (4th Cir. 1980); *Strand v. Hansen Seaway Serv., Ltd.*, 614 F.2d 572, 574 (7th Cir. 1980). We believe the statements in these cases are not sound. *Maryland Shipbuilding* bases its deference to the BRB on *O'Leary v. Brown-Pacific-Maxon, Inc.*, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483 (1951), a case decided when review of the decision of the ALJ or "deputy commissioner" was obtained first from a United States District Court, not a BRB. The *Maryland Shipbuilding* court does not specifically consider whether the ALJ's rather than the BRB's decision is entitled to deference, and,

in reversing the BRB and reinstating the ALJ's decision, does not *show* much deference for the BRB. The *Strand* court apparently did consciously defer to the BRB instead of the ALJ. However, its support for that deference, two Ninth Circuit decisions, is weak: *National Steel & Shipbuilding Co. v. Bonner*, 600 F.2d 1288, 1292 (9th Cir. 1979), without analysis relied on *O'Leary*, distinguished above; *Todd Shipyards Corp. v. Director, Office of Workers' Compensation Programs*, 545 F.2d 1176, 1178–79 (9th Cir. 1976), involved a BRB affirmance of an ALJ and could as easily be read as requiring deference to the ALJ, not the BRB. Further, the Ninth Circuit has since clarified its position, adopting the view held in this circuit. *Bumble Bee Seafoods v. Director, Office of Workers' Compensation Programs*, 629 F.2d 1327, 1329 & nn.1 & 2 (9th Cir. 1980).

able evidence provided no indication of trauma, creating the inference that intoxication was the sole cause of the partial unconsciousness and resulting death.

Two doctors testified in behalf of the claimant: Dr. Thomas A. Santoro, the medical examiner who conducted the autopsy on Jessie Walker, and Dr. Roland Goodman, who based his opinion solely on the reports of Dr. Santoro. Dr. Santoro found *no* evidence of trauma in his external examination of the body. Nor did he find any such evidence in his gross examination of the internal organs and tissues. Based on these observations, he then concluded that the cause of death was "asphyxiation, due to aspiration of gastric content." This aspiration, the doctor stated, came after Walker had vomited.

Dr. Santoro also had performed a toxicological examination for alcohol. The deceased's brain was found to have an ethyl alcohol content of 0.273 percent. Dr. Santoro concluded that, at the time of his death, Walker "was markedly under the influence of alcohol." In the doctor's opinion, "[a]n individual with an alcoholic content such as I have stated may be unconscious. . . . [S]ome individuals may vomit with an alcohol content of 0.273." The doctor concluded that such intoxication, unconsciousness and vomiting could lead to asphyxiation and death. This was the limit of Dr. Santoro's conclusion when he first made out the autopsy report. At that time *all* evidence indicated to him that intoxication was the sole cause of death.

Dr. Santoro subsequently changed his opinion and amended the autopsy report after (1) learning that Walker had a "[f]all on hatch while at work on ship," Request for Correction or Addition to Original Record of Birth, Marriage or Death, and (2) observing, in one of seventeen slides made with tissues from Walker's body, what he

believed to be a concussion hemorrhage. Dr. Santoro admittedly did not personally witness Walker on the ship the day of his death. In fact, no one saw Walker drop from that hatch, so it is impossible to conclude that he fell accidentally or intentionally jumped as was normal. Thus, the only acceptable evidence on which Dr. Santoro could base his conclusion that Walker's death was caused by accidental trauma was the single slide. But Dr. Santoro could not remember if it was he who had cut the tissue visible on that slide. Further, he admitted that he did not know and no records indicated from what section of the brain the specimen was taken.

Dr. Goodman relied solely on Dr. Santoro's autopsy reports and earlier depositions of Dr. Santoro and Walker's two co-workers, Muse and Pugh, for his opinion that "there is no evidence that this patient from the clinical or medical point of view was intoxicated."[4] Of course, Dr. Santoro's own testimony contradicts that opinion. Further, to reach the conclusion, Dr. Goodman admitted that he "was given as a fact to assume that [Walker] had been performing his duties in a normal competent manner." Finally, Dr. Goodman's conclusion that Walker suffered a head trauma was based solely on the autopsy report of Dr. Santoro. Universal Terminal presented two doctors on its behalf, Dr. Milton Halpern, retired Chief Medical Examiner of the City of New York, and Dr. Jacob D. Matis.

Dr. Halpern based his testimony on the report of Dr. Santoro and on *his own examination* of the slides of tissue taken from the body of Jessie Walker. Dr. Halpern's testimony squarely contradicted that of Dr. Santoro as to the presence in any of the slides of indications of hemorrhages or trauma.

Well, I found no evidence of hemorrhage, hemorrhages, gross or microscopic in any

4. The Benefits Review Board, in its initial Walker decision overturning the decision of the ALJ, BRB No. 77–102 (Feb. 28, 1978), stated that *"[t]hree eye-witnesses [sic] testified that between 1:00 p. m. and 1:45 p. m. decedent was in full control of his body motion up to the time of the injury."* In fact, only two co-workers

testified to Walker's pre-injury activities, and no other witnesses were even suggested. Such error indicates the minimal scrutiny the BRB gave the record before deciding to overturn the decision of the ALJ as not being supported by substantial evidence.

of the brain sections. There is congestion of the small blood vessels.

Concussion hemorrhages when present are not only visible to the naked eye, but would be found on microscopic examination. There does not seem to be any basis in the autopsy for a conclusion of accidental concussion. Now, this is my opinion that I am giving here, of the brain with hemorrhages.

I would therefore consider this a case of acute alchoholism [sic] with terminal regurgitation and aspiration of regurgitated material from the stomach.

Dr. Halpern amplified his conclusion, stating that "there were no hemorrhages noted in the brain and no indication here from the appearance of the brain that you could say this man suffered a concussion." The congestion of the blood vessels that Dr. Halpern found he attributed to alcoholism.

I think everyone who is acutely alchoholic [sic] develops a congestion of the tissues and organs 'of the body. If a person dies during an acute alchoholic [sic] episode, then this congestion will be evident. In fact, it is the most common finding in a person dying of alchoholism [sic], to find his organs congested.

The doctor not only disputed the only evidence of trauma, but provided a reasonable explanation of the condition that Dr. Santoro concluded was a hemorrhage.

Dr. Halpern also opined that had Walker suffered a head trauma of a type likely to have been caused by striking a pipe or the deck evidence other than that visible microscopically would have been observed.

[W]hen you get concussion of the brain due to a blunt-force injury of a diffuse or jarring type—you may not see anything on the outside of the scalp, but when you turn the scalp around or lay it back so that you can see the inside, you do find bruising of the scalp, on the inside. There was no injury of the scalp on the outside in this case. There was no bruising of the scalp on the inside and no hemorrhages to warrant a conclusion that there was a concussion effect in this man.

This injury to the scalp, Dr. Halpern stated, would appear immediately after the trauma and in all cases.

When you bump your head for example, sometimes like going through a door, you may not see anything on the outside. You feel discomfort. Now, on occasions where you have an opportunity of turning the scalp back, *you always find it.* (Emphasis added). This bruising, Dr. Halpern testified, would appear even if the injury occurred *after* death.

Thus, Dr. Halpern's opinion contradicted that of Dr. Santoro in two significant ways. First, he found nothing on the slides—the only source for Dr. Santoro's conclusion that Walker suffered a blow to his head—indicating hemorrhages or trauma. Second, relying on Dr. Santoro's observations that there was no other internal or external evidence of trauma, Dr. Halpern concluded that no trauma could have occurred, because it would have shown up on the inside of the scalp.

Dr. Halpern agreed with Dr. Santoro that Walker was intoxicated, both contradicting the testimony of Dr. Goodman. Dr. Halpern stated that the 0.273 percent level of alcohol "is a very large amount and that amount would indicate intoxication." According to Dr. Halpern, this level of alcohol would have been built up only by drinking approximately eight ounces of hard liquor.

Although accepting the testimony of Muse and Pugh that Walker did not exhibit by his conduct indications of intoxication and recognizing that Walker was found on the deck near a pipe, Dr. Halpern concluded that intoxication was the sole cause of Walker's death.

I can only find one explanation, one primary explanation or cause of this man's death and that is astute [sic] alchoholism [sic] with loss of consciousness, with aspiration of regurgitated material. If he hadn't regurgitated, he might have gotten over that acute attack of alchoholism [sic], but the fact is that he did regurgitate and he did aspirate. That is not an uncommon termination for a person who is under the influence of alchohol [sic].

I see nothing in this man's activity that is a factor in his death. I found no evidence of any traumatic injury, either grossly or microscopically. The only thing the autopsy revealed was a large amount of alchohol [sic] in the brain and so he had a case of acute alchoholism [sic].

.    .    .    .    .

The primary cause of death here is acute alchoholism [sic] and the complication that might have hastened his death was the regurgitation and aspiration of vomit, which happens very often in alchoholics [sic].

I find no indication of any injury here and no external injuries and no internal injuries, no anything in the way of traumas.

Dr. Halpern specifically discounted testimony of Walker's co-workers that Walker did not appear to be under the influence of alcohol "[b]ecause many persons who are under the influence of alchohol [sic] are not recognized as being in that state." Dr. Halpern found no other cause of Walker's death than alcohol.

Dr. Jacob D. Matis based his testimony on the reports of Drs. Santoro and Halpern. Not surprisingly, his statements added little. However, it is important to note that Dr. Matis agreed with Dr. Halpern that concussion hemorrhages would have been discernable not only in the single slide.

You don't get concussion hemorrhages without concommitent [sic] changes in the surrounding tissue. In other words, you can't traumatize the skull or the scalp or the meninges ... and not show it. If you show only what is called concussion hemorrhages, something is wrong somewhere.

This was the extent of the medical testimony on which the ALJ had to base his decision whether intoxication was the sole cause of Jessie Walker's death.

■ We hold that the administrative law judge was correct in concluding that the presumption against a finding that intoxication was the sole cause of death was rebutted. Only Dr. Goodman testified that

Walker was not intoxicated. Both Dr. Santoro, claimant's witness, and Dr. Halpern gave opinions that, on the basis of the undisputed test showing 0.273 percent alcohol in Walker's brain, the deceased was intoxicated. Further, the sole evidence of another cause, trauma, was the testimony of Dr. Santoro based on a single slide, and was refuted by the testimony of Dr. Halpern, who viewed the same slide. Finally, the testimony of both Drs. Halpern and Matis was clear that there was no evidence of another cause and that all the evidence indicated that trauma, the cause asserted by claimant, could not have been a cause.

■ We hold further that, with the presumption out of the case, the ALJ was amply supported by substantial evidence in the record as a whole for his conclusion that intoxication was the sole cause of Walker's death. Again the testimony of Dr. Halpern directly supports that conclusion. The employer need not introduce evidence refuting every imaginable theory of death. In this case there are only two plausible theories as to what triggered Walker's vomiting: The first, advanced by the claimant, is trauma—a blow to the head—that resulted in semi-consciousness and the vomiting in a man with a considerable amount of alcohol in his system. The second, urged by the employer, is the intoxication alone. Dr. Santoro's testimony that a slide showed a concussion hemorrhage is evidence, the only evidence, in support of the first. Dr. Halpern's testimony that the slide shows congestion from alcoholism, not hemorrhages, and that the requisite evidence of head trauma, bruises on the interior of the scalp, was missing, directly contradicts the testimony of Dr. Santoro and is evidence in support of the second theory. The administrative law judge was thus forced to make a choice based on the credibility of the two doctors. Had the ALJ decided to accept the version of Dr. Santoro, we could not say that there was not substantial evidence in support of that theory. *See C. F. Lytle Co. v. Whipple*, 156 F.2d 155, 156 (9th Cir. 1946). But the ALJ did not accept his testimony. He specifically gave the testimony of Dr.

Halpern "the greatest weight in evaluating the conflicting evidence of the autopsy." He thus accepted Dr. Halpern's opinion (1) that the slide showed alcohol-induced congestion, not hemorrhages, and (2) that if there had been even a gentle bump to Walker's head there would have been bruising on the inside of the scalp that would have been visible when the scalp was turned back. The ALJ therefore accepted the conclusion of the doctor that "the deceased did not strike his head either before or after death." In sum, the administrative law judge concluded:

> Therefore, it is found that Jessie Walker died on August 20, 1971, of asphyxia due to the aspiration of stomach contents as a result of loss of consciousness due to acute alchoholism [sic]. In other words the death was occasioned solely by the intoxiation [sic] of the employee and not due to an injury arising out of or in the course of employment.

(Footnote omitted). We cannot say that the ALJ was not supported by substantial evidence in crediting the testimony of Dr. Halpern, accepting the employer's theory of the cause of Walker's death and holding that the longshoreman's death was caused solely by intoxication. Because we believe the ALJ's conclusion was supported by substantial evidence, we hold that the Benefits Review Board exceeded its scope of review.

Therefore, the decision of the Benefits Review Board will be reversed with directions to reinstate the original decision of the administrative law judge denying the claim of Methel Walker for death benefits.