

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-24-2002

# Consolidation Coal v. Kramer

Precedential or Non-Precedential: Precedential

Docket No. 01-4398

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Consolidation Coal v. Kramer" (2002). *2002 Decisions.* Paper 598.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/598

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 24, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-4398

CONSOLIDATION COAL COMPANY,
Responsible Operator/Petitioner

v.

BEATRICE J. KRAMER, widow of
MARION W. KRAMER, deceased,
Claimant/Respondent

and

DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, United States Department of Labor
Party-in-Interest

On Appeal from the Benefits Review Board
U.S. Department of Labor
(BRB Docket No. 01-0118 BLA)

Submitted Under Third Circuit LAR 34.1(a)
July 30, 2002

Before: BECKER, Chief Judge, Roth and Rendell,
Circuit Judges.

(Filed: September 24, 2002)

WILLIAM S. MATTINGLY, ESQUIRE
Jackson & Kelly, PLLC
6000 Hampton Center
P.O. Box 619
Morgantown, WV 26507

Counsel for Petitioner
Consolidation Coal

CHERYL CATHERINE COWEN,
 ESQUIRE
769 Lippencott Road
Waynesburg, PA 15370

Counsel for Respondent
Beatrice J. Kramer, widow of
Marion W. Kramer, deceased

HELEN H. COX, ESQUIRE
PATRICIA M. NECE, ESQUIRE
United States Department of Labor

Office of the Solicitor
Suite N-2117
200 Constitution Avenue, NW
Washington, D.C. 20210

Counsel for Respondent
Director, Office of Workers'
Compensation Programs

OPINION OF THE COURT

BECKER, Chief Judge.

Consolidation Coal Company ("Consolidation") petitions for review of a determination of the United States Department of Labor Benefits Review Board (the "Board") that occupational pneumoconiosis hastened the death of Claimant Beatrice J. Kramer's deceased spouse, Marion W. Kramer ("Kramer"), who also suffered from metastasized colon cancer. Because we conclude that the Board's October 10, 2001 Decision and Order affirming the award to Claimant of survivor's benefits pursuant to Title IV of the Federal Coal Mine Health and Safety Act of 1969, as

2

amended, 30 U.S.C. SS 901 et seq. (the "Act") was supported by substantial evidence, including the competent opinion of the examining forensic pathologist, and was in accordance with the law, the petition will be denied.

I.

Kramer had more than thirty-three years of coal mine employment, and the parties have stipulated that he suffered from occupational black lung disease, a form of pneumoconiosis.1 During his lifetime, Kramer's claims for benefits were denied because testing conducted by Consolidation's examining physicians did not establish that Kramer was "totally disabled" by a respiratory or pulmonary impairment, as required for lifetime benefits. See 30 U.S.C. SS 901 et seq.

The Act and its implementing regulations provide compensation and other benefits to living coal miners and their dependents where the miner is totally disabled due to pneumoconiosis, and to miners' surviving dependents where death is due to pneumoconiosis. For purposes of the Act, death is considered due to pneumoconiosis if the disease was a "substantially contributing cause or factor" leading to death. 20 C.F.R. S 718.205(c). This term has been held to encompass situations in which pneumoconiosis "actually hastened" the miner's death. See, e.g., Shuff v. Cedar Creek Coal Co., 967 F.2d 977, 980 (4th Cir. 1992); Lukosevicz v. Director, OWCP, 888 F.2d 1001, 1004 (3d Cir. 1989) (stating that the test is whether the black lung disease "even briefly" hastened the miner's death).2

1. Pneumoconiosis is a chronic dust disease of the lungs and its sequelae that includes respiratory and pulmonary impairments. Black lung disease is a form of pneumoconiosis that arises out of exposure to coal dust.

2. It should be noted that the parties agreed by briefing to the ALJ that, as Kramer's last coal mine work (his final 17 years) was in West Virginia, the decisions of the Court of Appeals for the Fourth Circuit controlled this claim. See September 14, 2000 Decision and Order Granting Benefits at 3. Consolidation appealed to this Court on the basis of Kramer's prior employment history in Pennsylvania.

At the time of his initial application for lifetime benefits in 1991, Kramer testified that shortness of breath interfered with his ability to continue employment, prompting his early retirement at age 55, and Kramer's internist was of the opinion that Kramer was disabled by pneumoconiosis. The administrative law judge's (the "ALJ") 1992 decision concluded that Kramer's alleged shortness of breath was not totally disabling, based on testing performed by Consolidation's physician, Dr. Gregory Fino, whose diagnosis included pneumoconiosis. See September 14, 2000 Decision and Order Granting Benefits at 7. The last of Kramer's non-qualifying pulmonary function and blood gas studies was administered in 1996, when Kramer filed a duplicate claim, approximately two-and-one-half years prior to his death.[3] Shortly thereafter, Kramer was diagnosed with cancer of the colon, which metastasized to his liver and then to his lungs.

Following Kramer's death in October, 1998, Dr. Cyril Wecht ("Wecht") conducted an autopsy, reviewed Kramer's medical records, and concluded that Kramer died due to adenocarcinoma of the sigmoid colon with multiple metastases. Wecht also concluded that Kramer's "moderately severe pneumoconiosis" was a substantial contributing factor to his death in that the presence of this secondary disease process further compromised Kramer's respiratory function and added to his cardiovascular burden. Wecht explained that, were it not for the pneumoconiosis, Kramer's non-cancerous lung tissue would have been better able to maintain normal blood gas exchange, allowing Kramer to compensate for a longer time for the respiratory burden caused by the lung tumors. Kramer's treating surgeon, Dr. Michael Reilly ("Reilly"), concurred in the conclusion that pneumoconiosis hastened death, noting that as a result of this condition Kramer's lung tissue was less capable of maintaining oxygenation and $CO_2$ exchange than it otherwise would have been, so

---

3. Although they remained within normal limits, Kramer's pulmonary function results decreased from a high of 110% of normal to 85% of normal. See September 14, 2000 Decision and Order Granting Benefits at 27 (citing deposition testimony of Dr. Fino).

that Kramer could tolerate and compensate for less "tumor load" than an individual with otherwise healthy lung tissue.

In the original hearing on Claimant's request for survivor's benefits, Consolidation submitted to the ALJ the medical opinions of its own pathologists, Drs. Jerome Kleinerman, Joseph Tomashefski, and Richard Naeye, and that of a pulmonary disease specialist, Dr. Gregory Fino.4 Each of Consolidation's experts concluded that Kramer's pneumoconiosis did not hasten death. As a basis for this conclusion each expert cited the absence of clinically significant lung dysfunction during Kramer's lifetime and the premise that Kramer's pneumoconiosis was a non-progressive disease, i.e., one that does not worsen after a miner leaves employment.

In the Decision and Order Granting Benefits, the ALJ concluded that Kramer's pneumoconiosis hastened, and was therefore a substantially contributing factor in, Kramer's death, pursuant to 20 C.F.R. S 718.205(c)(2).5 In so holding, the ALJ discussed the medical evidence in great detail and declined to accept the lifetime studies as dispositive. Rather, the ALJ focused on the evidence of Kramer's pulmonary condition near the time of death. In addition, he expressly accorded less weight to Consolidation's experts because of the import they affixed to the lifetime studies.6 On appeal to the Board,

_____

4. As discussed above, Dr. Fino performed the lifetime studies which were the basis of the 1992 denial of Kramer's claim. At that time, Dr. Fino diagnosed pneumoconiosis, but the studies did not demonstrate total disability, as required for lifetime benefits. See supra at 2.
5. See September 14, 2000 Decision and Order Granting Benefits at 36 (accepting as viable the theory that "a [m]iner's condition can be so weakened that he had a susceptibility caused by pneumoconiosis that hastened death"); id. at 14 n.16 (citing Kirk v. Director, OWCP, 86 F.3d 1151 (4th Cir. 1996) (holding that increased susceptibility can hasten death because "[d]iseases . . . kill the weak more readily than the strong").

6. See September 14, 2000 Decision and Order Granting Benefits at 37. The ALJ also accorded less probative value to these reports because he found them to be internally inconsistent and inadequately reasoned, and because they omitted consideration of other physical evidence of pneumoconiosis, such as enlargement of the right side of the heart and clubbing of the fingers. These conclusions are discussed in detail throughout the Decision and Order Granting Benefits. See id.

Consolidated contended, as it does before this Court, that the ALJ erred in his weighing of the medical evidence and substituted his own judgment for that of the medical experts. The Board rejected these contentions in toto and affirmed Claimant's entitlement to survivor's benefits. We have appellate jurisdiction in this matter pursuant to 20

C.F.R. S 410(a).

II.

The determinations of the Benefits Review Board are reviewed only "for error of law and to assure . .. that it has properly adhered to its scope of review." Walker v. Universal Terminal and Stevedoring Corp., 645 F.2d 170, 172 (3d Cir. 1981). The decision of the administrative law judge must be affirmed by the Board if it is supported by substantial evidence and is in accordance with the law. See 33 U.S.C. S 921(b)(3); 30 U.S.C. S 932(a); 20 C.F.R. S 802.301; see also O'Keeffe v. Smith, Hinchman & Grylls Assocs., Inc., 380 U.S. 359 (1965); Oravitz v. Director, OWCP, 843 F.2d 738, 739 (3d Cir. 1988).[7] Appellate review thus necessarily entails an independent review of the record and a decision as to whether the administrative law judge's findings were supported by substantial evidence. Walker, 645 F.2d at 172. Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Richardson v. Perales , 402 U.S. 389, 401 (1991); Kertesz, 788 F.2d at 163.

A claimant is entitled to survivor's benefits pursuant to 20 C.F.R. S 718.205(c) if she demonstrates by a preponderance of the evidence that the miner had pneumoconiosis arising from his employment and that the pneumoconiosis was a substantial contributing cause or factor in -- defined as one which hastened -- the miner's

_____

7. In reaching his decision, the administrative law judge has discretion to accord varying weight to physician testimony. See 20 C.F.R. S 718.206; Kertesz v. Crescent Hills Coal Co., 788 F.2d 158 (3d Cir. 1986) (noting that an administrative law judge is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw his own inferences).

6

death. See 20 C.F.R. SS 718.205(a)(1)-(3), (c)(2), (4) and (5); see also supra p. 3.

III.

Consolidation first asserts that all evidence attributable to Wecht should have been disregarded because Wecht failed to include a uniquely detailed description of his microscopic findings in his autopsy report. The microscopic findings portion of that report simply referred to findings consistent with the gross autopsy report;[8] in addition, a supplemental report contained a detailed, though standardized, description of his microscopic findings.[9] Consolidated asserts that Wecht's use of a reference to findings consistent with the gross autopsy in his autopsy report, and his use of a standard description of microscopic findings in supplemental reports on pneumoconiosis, do not comply with statutory requirements and constitute a "fail[ure] to provide a meaningful microscopic description"

of Kramer's lung tissue. See Consolidation's Brief in
_____

8. Wecht testified that the microscopic portion of the autopsy report referred to findings that confirmed the gross autopsy, and that he only includes additional detail in the microscopic description if microscopic examination reveals findings in addition to those already reflected in the gross autopsy. In this case, the gross autopsy report encompassed Kramer's black lung disease as, for example, in the description of the lungs as having an "intervening pulmonary parenchyma show[ing] black anthracotic markings and small nodules, which [were] separate and discrete from the large tumor masses." See JA 011-012.

9. Wecht wrote:

> The microscopic autopsy slides which I have prepared show diffuse depositions of black anthracotic pigment in the peribronchiolar and periarteriolar lymphatics. Ruptured alveolar walls, consistent with pulmonary emphysema, pulmonary fibrosis, thickening of the pleura with subpleural deposits of anthracotic pigment, fibroanthracotic and fibrohyaline macules and micronodules, and fibroanthracosis and fibrohyalinization of mediastinal and peribronchial lymph nodes, are also noted. In addition, examination of lung tissue under polarized light reveals scattered birefringent crystals, consistent with silica. All these findings in the lungs are compatible with the antemortem history and a clinical diagnosis of pneumoconiosis.

Director's Exhibit 13 at 2.

Support of Petition for Review at 9; 20 C.F.R. S 718.106(a) (requiring that an autopsy report include a "detailed gross macroscopic and microscopic description" of the lung). The ALJ and the Board found that the autopsy report was "consistent in form with the regulation." October 19, 2001 Decision and Order at 8 (citing Dillon v. Peabody Coal Co., 11 BLR 1-113, 114-15 (1988)).

In Dillon, the Board held that "while the[ALJ] should consider the quality standards found in Section 718.106, the standards are not mandatory, and autopsy or biopsy reports cannot be mechanically precluded from consideration . . . solely because [of failure] to comply with those standards." To the contrary, in reviewing the autopsy evidence, the ALJ "should determine whether the missing information is essential to the reliability or the probative value of the report" and, where such information is non-essential, the ALJ may consider and accept the report. The Board held that this determination "can only be made by the [ALJ], as fact-finder, based on the unique facts of each case" and that the ALJ is not limited to "the four corners" of the autopsy report in determining its reliability, but "may look to other supportive documents in the record in an attempt to cure any defects in the actual report." Id.

Although the regulations require that the report include a microscopic description of the lungs, they contain no express requirements regarding the form or nature thereof.

Here, the autopsy report stated that the microscopic findings were "consistent with", i.e., confirmed, the gross autopsy findings, and incorporated by reference the detailed findings contained elsewhere in the report. The report therefore complied with the letter of the regulation, and Consolidation is thus asking this Court to impose additional formal requirements which both the ALJ and the Board expressly declined to impose. Most importantly, it should be noted that there is no suggestion that the microscopic findings reflected in Wecht's standardized language were in any way inaccurate nor that they did not represent his actual findings in this case. Cf. Director, OWCP v. Mangifest, 826 F.2d 1318, 1327 (3d Cir. 1987) (holding that medical judgment contained in a noncomplying report may constitute substantial evidence of

8

disability if it is reasoned and based on medically acceptable clinical and laboratory diagnostic techniques).

Each of Wecht's findings and conclusions was agreed with by one or more of Consolidation's medical experts. Moreover, the microscopic findings on which Consolidation sought to bar consideration of Wecht's evidence, including his testimony, are collateral to Consolidation's current disagreement with Wecht's testimony, which turns on his finding of causation. That finding was manifestly not boilerplate, but was specifically explained in the context of this case. Nothing in the regulations or authority suggests that a technical deficiency in an autopsy report renders separate expert opinions delivered by the examining pathologist incompetent.

Finally, we owe substantial deference to the Board's interpretation of its own administrative regulatory requirements. The Board's finding that Wecht's autopsy report was consistent with the applicable regulation was a reasonable interpretation of that regulation and, accordingly, Consolidation's petition for review will be denied.10

IV.

Consolidation maintains that the Board's affirmance of the ALJ's decision must be set aside because it was not supported by substantial evidence. Consolidation's position, and that of its experts, is that pneumoconiosis is a non-progressive disease. Each of Consolidation's experts cites to and expressly relies upon Kramer's continued ability to

---

10. Consolidation also asserts that Wecht's reports and testimony should have been disregarded because Wecht testified that, in his experience, where there is evidence of a significant degree of pneumoconiosis, it is a contributing factor to death in the great majority of cases (approximately 85 to 90%). See Consolidation's Brief in Support of Petition for Review at 20. Consolidation argues that this testimony evinces a "dogmatic" view that must be disregarded. See id. at 25. To the contrary, an opinion

couched in terms of a range of probability cannot fairly be characterized as an article of faith. In addition, Wecht's extensive pathology experience renders him well qualified to form an opinion with respect to that probability range.

complete pulmonary function testing and arterial blood gas studies with results within normal limits -- testing that demonstrated no clinically significant impairment in his pulmonary capacity up to two and one-half years prior to death -- in concluding that Kramer's pneumoconiosis could not have contributed in any degree to his pulmonary burdens and consequently hastened death.11

Thus, Consolidation's experts expressly predicated their opinions on the tenet that Kramer's pneumoconiosis could not have progressed.12 Consolidation argues that the ALJ's "failure to meaningfully weigh and analyze" these experts' evidence "requires the decision be set aside and remanded." Consolidation's Brief in Support of Petition for Review at 22.

As both the ALJ and the Board found, the tenet that pneumoconiosis is non-progressive is simply inconsistent with the "assumption of [disease] progressivity that underlies much of the statutory regime." October 19, 2001 Decision and Order at 9. See 20 C.F.R. S 718.201(c) ("[P]neumoconiosis is recognized as a latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure."); Mullins Coal Co. of Va. v. Director, OWCP, 484 U.S. 135, 151 (1987). Indeed, our sister Courts of Appeals have uniformly observed this presumption and have gone so far as to caution the industry against continuing to advance an insufficiently supported position to the contrary. See, e.g. , Peabody Coal

---

11. It should be noted that although Consolidation continues to dispute Wecht's diagnosis of Kramer's pneumoconiosis as "moderately severe", as opposed to "simple", both Reilly and Consolidation's own expert, Dr. Naeye, agreed with Wecht's diagnosis. See September 14, 2000 Decision and Order Granting Benefits at 13 (citing Dr. Naeye's testimony that the autopsy slides showed moderately severe pneumoconiosis). Cf. LaBelle Processing Co. v. Swarrow, 72 F.3d 308, 315 (3d Cir. 1995) (rejecting employer's contention that simple pneumoconiosis is not progressive).

12. Two of Consolidation's experts, Drs. Kleineman and Fino, specifically conclude that there can be no contributing factor finding absent a substantiation of lifetime impairment. A third expert, Dr. Naeye, does allow a few exceptions to the rule of non-progressivity, including where a miner was employed as a roof bolter, which in fact Kramer had been. See September 14, 2001 Decision and Order Granting Benefits at 12.

Co. v. Spese, 117 F.3d 1001 (7th Cir. 1997) (en banc) (noting that progressivity is inherent in the duplicate claims

regulation itself); Lovilla Coal Co. v. Harvey , 109 F.3d 445 (8th Cir. 1997); Orange v. Island Creek Coal Co. , 786 F.2d 724, 727 (6th Cir. 1986); Old Ben Coal Co. v. Scott, 144 F.3d 1045 (7th Cir. 1998) (holding that the Department of Labor's view that the disease is progressive "may be upset only by medical evidence of the kind that would invalidate a regulation"). See also LaBelle, 72 F.2d at 314-315.13 Accordingly, the ALJ was well within his discretion in discounting the opinions of Consolidation's experts as, if not hostile to the Act, at least premised on a legally untenable presumption.14

In addition, even if the disease were not progressive, the mere absence of any "clinically significant" pulmonary impairment two and one-half years prior to Kramer's death -- in tests conducted to determine Kramer's qualification for lifetime benefits, which depended on a finding of total disability -- certainly does not establish that Kramer had

_____

13. In LaBelle, we observed that:

> A latent condition such as pneumoconiosis may not become maniest until long after exposure to the caustive agent (i.e. coal dust). Indeed, Congress, in enacting the BLBA, recognized the perniciously progressive nature of this disease.

Id. (citations omitted).

14. See, e.g., Thorn v. Itmann Coal Co., 3 F.3d 713, 719 (4th Cir. 1993) (directing that an administrative law judge must not rely upon the opinion of an expert who expresses an opinion based on a premise "antithetical to the Black Lung Benefits Act" because such opinion "is not probative" and stating that a physician's opinion may be discredited when it is based on "a premise fundamentally at odds with the statutory and regulatory scheme"). See also September 14, 2000 Decision and Order Granting Benefits at 18 n.20 (citing additional Courts of Appeals cases)

For these same reasons, Consolidation's argument that Wecht's evidence should be disregarded because he dismissed the lifetime studies as irrelevant to the question of the contribution to death is without merit. Cf. Consolidation's Brief in Support of Petition for Review at 21-22 (asserting that Wecht's opinion was not well reasoned because he failed to compare the pathology results to the lifetime studies of ventilatory function and arterial blood gas analysis).

incurred no damage to his lung tissue and no pulmonary burden of any degree whatsoever as a result of his occupational exposure. Indeed, nothing in the evidence that Consolidation points to would negate the conclusion that a preexisting pulmonary burden, albeit insufficient standing alone to result in a measurable loss of lung function, could nonetheless in combination with a further affront to the pulmonary system through advancing cancer have decreased to some degree the lungs' ability to continue to compensate.15

As the Board noted, the ALJ applied the proper test, which is whether pneumoconiosis hastened the miner's death in any way. See 20 C.F.R. S 718.205(c)(4). And as the ALJ correctly concluded, lifetime disability or impairment "is not an element of proof in 'hastening'." September 14, 2000 Decision and Order Granting Benefits at 30. Assessing the evidence from the proper perspective, and taking into account the statutory assumptions regarding the progressive nature of the disease, the ALJ reasonably discounted the evidence of those experts who relied heavily on lifetime studies administered between 1991 and 1996 in concluding that pneumoconiosis did not hasten Kramer's death in October, 1998. See October 19, 2001 Decision and Order at 10 (citing Milburn Colliery Co. v. Hicks. 138 F.3d 524, 533 (4th Cir. 1998) (observing that an administrative law judge must assess the quality of a physician's reasoning). In addition, as the Board also noted, the unequivocal opinions of Wecht and Reilly, on which the ALJ relied, explained clearly how pneumoconiosis hastened the

---

15. As Reilly testified, pulmonary function tests taken years prior to Kramer's death are unhelpful to the determination of causation, as the lungs have a great ability to compensate for underlying disease. While pulmonary function studies may be an appropriate measure for a determination of lifetime disability, an ability to pass such tests within normal limits simply does not demonstrate that the subject's lungs are healthy. To the contrary, as noted above, Consolidation's examining physician, Dr. Fino, diagnosed Kramer's pneumoconiosis in 1991. In addition, another of Consolidation's experts, Dr. Tomashefski, testified that, on the basis of Kramer's 1996 pulmonary studies, the degree of pneumoconiosis present in Kramer's lung tissue may have caused mild respiratory impairment and some physical limitations.

12

miner's death.16 Where the ALJ has discussed the qualifications of the competing physicians and the quality of their respective reasoning, and substantial evidence supports the ALJ's findings, which are in accordance with law, the Board will not be held to have erred in affirming his decision.17

---

16. See, e.g., September 14, 2000 Decision and Order Granting Benefits at 29 (quoting Wecht's evidence that "[t]he secondary disease process, pneumoconiosis, added to the cardiovascular burden, added to the presence of hypoxemia . . . some diminution of oxygenation, and thereby contributed to [Kramer's] death"); id.  at 30 (quoting Reilly's evidence that the cancer cells "cause death when their replacement of normal tissue causes residual noncarcinogenic tissue to fail in their normal physiologic mechanism, therefore the pneumoconiosis . . . certainly did contribute to the patient's death").

Consolidation's assertions on appeal that Wecht's determination of causation turned on a controversial finding of hypoxemia notwithstanding, the ALJ was careful to note in his decision that causation did not turn on hypoxemia, but was based on multi-faceted

findings, including Wecht's findings of right-side hypertrophy of the heart (concurred in by Consolidation's expert, Dr. Tomashefski), cor pulmonale (a right ventricular enlargement secondary to lung malfunction), and a widening of Kramer's fingers (commonly called "clubbing"), all indicative of chronic obstructive pulmonary disease. Compare Consolidation's Brief in Support of Petition for Review at 24 with September 14, 2000 Decision and Order Granting Benefits at 9, 25, 30, 32-33 & n.44.

17. Finally, Consolidation argues that the ALJ erred in premising his decision on a "presumption" that pneumoconiosis is always progressive. See Consolidation's Reply Brief at 6, 42. However, we do not read the opinion of the ALJ, or that of the Board, as adopting or applying any such presumption. Rather, the ALJ and the Board properly accorded diminished weight to the opinions of Consolidation's experts to the extent they were predicated on the impermissible assumption that the disease process is never progressive. See, e.g., September 14, 2000 Decision and Order Granting Benefits at 24 n.32 (discussing Dr. Kleinerman's position as in contrast to the often stated rule that pneumoconiosis is a disease process which may be progressive in nature).

13

V.

It is not the function of this Court to weigh conflicting evidence. Competent evidence for the Claimant tends to establish that pulmonary burden from occupational pneumoconiosis hastened her husband's death from cancer. The ALJ was entitled to accept this evidence and to assign it greater weight than Consolidation's contrary evidence; it is not for us to re-weigh. The petition for review of the decision of the Board will therefore be denied.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

14